**Opinion issued October 28, 2025**



**In The**

# Court of Appeals

**For The**

# First District of Texas

_____

**NO. 01-23-00297-CV**
_____

## IN THE INTEREST OF N.L.S., E.J.C., AKA E.J.C., CHILDREN

---

**On Appeal from the 300th District Court**
**Brazoria County, Texas**
**Trial Court Case No. 114085-F**

---

## MEMORANDUM OPINION ON REMAND

In this accelerated appeal, Father challenges the trial court's order terminating his parental rights to "Nicholas."[1]  In our initial opinion, we held that there was

---

[1] Pursuant to the Texas Rules of Appellate Procedure, we use an alias to refer to the child and to his parents. *See* TEX. R. APP. P. 9.8(b)(2) (providing that, in parental-rights termination cases, "the court must, in its opinion, use an alias to refer to a minor, and if necessary to protect the minor's identity, to the minor's parent or other

legally insufficient evidence to support the trial court's finding under Family Code Section 161.001(b)(1)(E) that Father engaged in conduct that endangered Nicholas's physical or emotional well-being.[2]   And we reversed the trial court's order of termination. *See In re N.L.S.*, 716 S.W.3d 612 (Tex. App.—Houston [1st Dist.] 2023), *rev'd in part*, 715 S.W.3d 760 (Tex. 2025).

The Texas Supreme Court reversed and held that our analysis conflicted with its recent decisions in *In re R.R.A.*, 687 S.W.3d 269 (Tex. 2024), and *In re J.F.-G.*, 627 S.W.3d 304 (Tex. 2021).  Based on its reasoning in those decisions, the supreme court concluded that legally sufficient evidence supports the trial court's endangerment finding. *In re N.L.S.*, 715 S.W.3d at 762.  It then remanded the case to our Court to address whether factually sufficient evidence supports the trial court's endangerment finding and whether legally and factually sufficient evidence supports the trial court's determination that termination of Father's parental rights is in Nicholas's best interest. *Id.*  Because we conclude that these evidentiary hurdles

---

family member").  In its brief, the Department of Family and Protective Services refers to the child as "Nicholas."

[2]   In our initial opinion, we also affirmed the trial court's judgment terminating Mother's parental rights to Nicholas and another child, "Eleanor."  Mother did not petition the supreme court for review.  And Eleanor is not Father's child—her father did not appeal the trial court's order terminating his parental rights.  Thus, our opinion on remand in this case is limited to a review of the termination of Father's parental rights to Nicholas only.

are cleared, we affirm the trial court's order of termination as to Father with respect to Nicholas.

## Background

The facts of this case are discussed at length in this Court's and the supreme court's prior opinions. The facts pertinent to the issues on remand, many of which are identified in the supreme court's opinion, are as follows. *See id.* at 762–63.

In 2021, Nicholas was living with his mother. A neighbor called the police to report that Nicholas, who was five years old at the time, had come to the neighbor's house several mornings in a row hungry and wearing the same dirty clothes. The neighbor said that Nicholas stayed at her house for hours and no parents checked on him. *See id.* at 762.

In response to the neighbor's call, the police performed a welfare check at Mother's residence. When the police arrived, Nicholas answered the door and said he was alone. The officers searched the home but did not find a caretaker. They took Nicholas to the police station and contacted the Department of Family and Protective Services (DFPS). Officers later returned to the residence and found Mother, her infant daughter (Eleanor), and another adult. Both Nicholas and Eleanor were taken into DFPS's custody. *See id.*

Father has an extensive and escalating criminal history. Since 2008, he has been convicted of twelve crimes, including at least five felonies. He has twice been

convicted of family violence, though neither of those convictions involved Nicholas or Mother. He has twice been convicted of possession of methamphetamine; one of those convictions stems from a 2019 arrest that occurred on the same day he visited Nicholas at Mother's home prior to Nicholas's removal. Father's other convictions include burglary, theft of a firearm, felon in possession of a firearm, evading arrest, and credit card abuse. His most recent conviction was in 2021—six months before Nicholas's removal—on five counts: (1) felon in possession of a firearm; (2) possession of a prohibited weapon; (3) evading arrest or detention; (4) assault of a family member; and (5) possession of methamphetamine. He received a five-year sentence and was incarcerated when his parental rights were terminated. *See id.*

Father has been incarcerated for much of Nicholas's life. He was incarcerated when Nicholas was born in 2015, he was incarcerated when DFPS removed Nicholas from Mother's care in 2021, and he was incarcerated when the trial court terminated his parental rights in 2023. But he has spent time with Nicholas between his sentences. For instance, Father lived with Nicholas and Mother for two months in 2018, and he testified that after that, he visited Nicholas "[q]uite a few times"— though the last time he saw Nicholas was in 2019 when Nicholas was three years old. *See id.* at 762–63.

After the DFPS initiated this suit, a caseworker met with Father in jail six or seven times. At trial, the same caseworker testified that, during one of those visits,

4

Father "stated that [Mother] was not a good mother" and "was never home" and that he was "the one taking care of [Nicholas]" when he and Mother were "together." But when Father testified, he denied making those statements. He further testified that Mother was an attentive parent when they lived together and that her home was clean. When he visited them, he said, he had no concerns that Mother neglected Nicholas. He testified that he did not know Mother used drugs or had a history with DFPS. *See id.* at 763.

DFPS's service plan did not require Father to complete any services. He testified that he worked seven days a week as a welder for the sheriff's department and attended GED classes while incarcerated. He further testified that he was working through parenting papers provided by DFPS but had not completed them. He planned to attend narcotics anonymous classes in prison, and he testified that he requested video visits with Nicholas but did not receive a response to that request. The DFPS caseworker testified that she did not recall Father asking for video visits. *See id.*

When asked whether he had a relationship with Nicholas, Father responded that he was incarcerated when Nicholas was born so he did not "have much of a relationship with him." But Nicholas "knows who [Father is]." Father had not provided any child support for Nicholas since his birth, and he did not know Nicholas's grade in school, favorite subject, favorite color, or favorite food. Father

5

testified that, at the time of trial, he could not provide Nicholas with a safe and stable home. Nor could he provide DFPS with an alternative placement for Nicholas. *See id.*

Nicholas's guardian ad litem recommended that Father's parental rights be terminated because his conduct "subjected [Nicholas] to a life of uncertainty and instability that[ ] endanger[ed] [Nicholas's] physical and emotional well-being." Specifically, Father's repeated incarcerations left Nicholas "in a state of flux" because he did not know if Mother or Father could be "going to . . . jail one day or the next." *Id.*

At the conclusion of the trial, the trial court found that Father engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child and that termination of Father's parental rights was in Nicholas's best interest. *See id.*; TEX. FAM. CODE § 161.001(b)(1)(E), (2).

**Termination of Father's Parental Rights**

As instructed by the supreme court, we consider on remand whether factually sufficient evidence supports the trial court's endangerment finding under Section 161.001(b)(1)(E) and whether legally and factually sufficient evidence supports the trial court's determination that termination of Father's parental rights is in Nicholas's best interest.

## A. Standard of Review and Applicable Law

A parent's "right to the companionship, care, custody, and management of his or her children is an interest far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982) (internal quotations omitted). "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Id.* at 759. "A parent's interest in the accuracy and justice of the decision to terminate his or her parental status is, therefore, a commanding one." *Id.* (internal quotations omitted). Thus, we strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).

"[T]he rights of natural parents are not absolute[,] protection of the child is paramount," and "[t]he rights of parenthood are accorded only to those fit to accept the accompanying responsibilities." *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003). Recognizing that a parent may forfeit his parental rights based on his actions or omissions—the primary focus of a termination suit is protection of the child's best interests. *Id.*

Accordingly, "[i]n parental termination cases, due process mandates a clear and convincing evidence standard of proof." *In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019); *see also* TEX. FAM. CODE § 161.001(b). "Clear and convincing evidence" is "the measure or degree of proof that will produce in the mind of the trier of fact a

firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007; *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). "This heightened burden of proof affects the standard of review in an evidentiary challenge on appeal." *In re J.W.*, 645 S.W.3d 726, 741 (Tex. 2022).

"To that end, in reviewing a legal-sufficiency challenge, we must determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *Id.* (internal quotations omitted). "[W]e look at all the evidence in the light most favorable to the finding, assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id.* (internal quotations omitted). We may not, however, "disregard undisputed facts that do not support the finding." *Id.* (internal quotations omitted).

In conducting a factual-sufficiency review in this context, a reviewing court should give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. *See In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). And the court should consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so

significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

Under these standards, the factfinder remains "the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014). In a bench trial, the trial court, as factfinder, weighs the evidence and resolves evidentiary conflicts. *In re R.J.*, 579 S.W.3d 97, 117 (Tex. App.—Houston [1st Dist.] 2019, pet. denied).

Section 161.001(b) of the Family Code authorizes an "involuntary termination of parental rights if a court finds by clear and convincing evidence both that a parent engaged in one or more enumerated predicate grounds for termination and that termination is in the best interest of the child." *In re M.P.*, 639 S.W.3d 700, 701–02 (Tex. 2022) (citing TEX. FAM. CODE § 161.001(b)(1)(A)-(U), (b)(2)).

## B. Factual Sufficiency of Endangerment

Section 161.001(b)(1)(E) of the Family Code authorizes a trial court to order termination of a parent-child relationship if it finds by clear and convincing evidence that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(E).

To "endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *See Tex. Dep't of Hum. Servs. v. Boyd*, 727

S.W.2d 531, 533 (Tex. 1987); *Walker v. Tex. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 616 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). A child is endangered if her environment creates a potential for danger that the parent disregards. *In re N.J.H.*, 575 S.W.3d 822, 831 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). "As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied).

For instance, "[i]ntentional criminal activity that exposes a parent to incarceration is conduct that endangers the physical and emotional well-being of a child." *In re V.V.*, 349 S.W.3d 548, 554 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). Abusive and violent criminal conduct by a parent can also produce an environment that endangers a child's well-being and evidence that a person has engaged in such conduct in the past permits an inference that the person will continue violent behavior in the future. *Jordan v. Dossey*, 325 S.W.3d 700, 724 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

Although "mere imprisonment will not, standing alone, constitute engaging in conduct which endangers the emotional or physical well-being of a child, . . . incarceration does support an endangerment finding if the evidence, including the imprisonment, shows a course of conduct which has the effect of endangering the physical or emotional well-being of the child." *In re J.F.-G.*, 627 S.W.3d 304, 312–

10

13 (Tex. 2021) (quoting *Boyd*, 727 S.W.2d at 533–34). Thus, our supreme court has held that "[a] parent's criminal history—taking into account the nature of the crimes, the duration of incarceration, and whether a pattern of escalating, repeated convictions exists—can support a finding of endangerment." *Id.* at 313.

"Termination under subsection (E) must be based on more than a single act or omission . . . ." *Jordan*, 325 S.W.3d at 723. A parent's conduct prior to the child's birth and either before or after the child's removal by DFPS may be considered. *Walker*, 312 S.W.3d at 617. Offenses occurring before the child's birth can be considered as part of a voluntary, deliberate, and conscious course of conduct that has the effect of endangering the child. *Id.*

And "[a] parent's past endangering conduct may create an inference that the past conduct may recur and further jeopardize the child's present or future physical or emotional well-being." *In re J.D.G.*, 570 S.W.3d 839, 851 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). To support termination under subsection (E), it is not necessary to establish that a parent intended to endanger the child. *Id.* And the endangering conduct need not have occurred in the child's presence. *Walker*, 312 S.W.3d at 617.

Here, DFPS presented factually sufficient evidence to support the trial court's finding that Father engaged in conduct that endangered Nicholas's physical or emotional well-being. For instance, although mere imprisonment alone is not

11

sufficient to support termination under subsection (E), as the supreme court explained, the evidence here demonstrates that Father repeatedly engaged in a course of escalating criminal activity both before and after Nicholas's birth. *See In re N.L.S.*, 715 S.W.3d at 765; *In re J.F.-G.*, 627 S.W.3d at 312–13. Specifically, as detailed above, Father has twelve convictions for increasingly serious crimes. Included in these convictions are possession of methamphetamine, burglary, theft of a firearm, felon in possession of a firearm, evading arrest, credit card abuse, and family violence assault. *In re N.L.S.*, 715 S.W.3d at 765.

Further, Father's criminal record shows a pattern of escalating conduct, continuing for a period almost 15 years, not an isolated incident. *See id.*; *In re J.F.-G.*, 627 S.W.3d at 315. It is true that half of Father's crimes occurred before Nicholas was born. *See In re N.L.S.*, 715 S.W.3d at 765. But courts may consider a parent's criminal record beginning before a child's birth as evidence of an endangering course of conduct. *See id.*; *In re J.F.-G.*, 627 S.W.3d at 315.

Importantly, Father did not stop engaging in criminal activity after Nicholas was born, "when he would (or should) have been aware that criminal conduct . . . risked separating him from [Nicholas] for years, as, in fact, it did." *See In re J.F.-G.*, 627 S.W.3d at 315; *see also In re N.L.S.*, 715 S.W.3d at 765. In fact, Father's criminal conduct has prevented him from seeing Nicholas since 2019, when Nicholas was three years old. *See In re J.F.-G.*, 627 S.W.3d at 316 (holding father's

8-year absence from 11-year-old child's life "resulting from criminal conduct" was sufficient evidence to support trial court's endangerment finding). This prolonged absence from Nicholas's life—a direct result of Father's criminal conduct—necessarily endangers Nicholas's physical and emotional well-being. *See In re N.L.S.*, 715 S.W.3d at 765 (citing *Walker*, 312 S.W.3d at 617 ("Conduct that routinely subjects a child to the probability that the child will be left alone because a parent is jailed endangers both the physical and emotional well-being of the child.")).

Moreover, two of Father's convictions involved family violence—and one of those convictions occurred after Nicholas's birth. Abusive and violent criminal conduct by a parent can produce an environment that endangers a child's well-being, and evidence that a person has engaged in such conduct in the past permits an inference that the person will continue violent behavior in the future. *See Jordan*, 325 S.W.3d at 724. And although none of Father's convictions involve the physical abuse of Nicholas, "it is not necessary that the [parent's] conduct be directed at the child or that the child actually suffers injury" to show endangerment. *See Boyd*, 727 S.W.2d at 533.[3]

---

[3] *See also In re M.M.M.*, No. 01-21-00269-CV, 2021 WL 5365102, at \*10–11 (Tex. App.—Houston [1st Dist.] Nov. 18, 2021, pet. denied) (mem. op.) (noting that "want of self-control[] and a propensity for violence may also be considered as evidence of endangerment" and considering evidence of mother's violent criminal

In conducting our factual-sufficiency review, we acknowledge that we must consider, in light of the entire record, whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. Here, there was some limited evidence favorable to Father, including his testimony that he lived with Nicholas and Mother for two months in 2018 and that he visited Nicholas "[q]uite a few times" after they no longer lived with him. Father also testified that he requested video visits with Nicholas while he was incarcerated.

As detailed by the supreme court, there was also disputed evidence as to whether Father knew that N.L.S. would be endangered in Mother's care. *See In re N.L.S.*, 715 S.W.3d at 765–66. The DFPS caseworker testified that when she visited Father while he was incarcerated, he told her that Mother was "not a good mother," that she "was never home," and that while they were together, "he was the one taking care of [Nicholas]." Yet Father denied making those statements. Instead, Father testified that, when Mother and Nicholas lived with him, he had no concerns about Mother's parenting, Mother was attentive to Nicholas's needs, and there was nothing in Mother's behavior that made Father think she would be neglectful or endangering to Nicholas.

---

history, even though not directed at her child, as supporting trial court's endangerment finding).

14

But a reasonable factfinder could have reasonably credited disputed evidence in favor of its finding. Particularly in light of the evidence that any purported "lack of knowledge" by Father of Nicholas's living situation "resulted from criminal conduct that led to [Father's] incarceration and his indifference to his [son] while he was incarcerated." *See In re J.F.-G.*, 627 S.W.3d at 315; *see also In re N.L.S.*, 715 S.W.3d at 766. Indeed, Father's own testimony reflects that he has never provided Nicholas with financial assistance, that he could not provide a safe and stable home for Nicholas, and that he could not provide DFPS with any alternative placements. *See In re N.L.S.*, 715 S.W.3d at 766.

Father also admitted that he does not "have much of a relationship with [Nicholas]" and that he does not know Nicholas's grade in school, favorite color, or favorite food. *See id.* And he does not know "a whole lot about" Nicholas. *See id.* The guardian ad litem further testified that Nicholas has no emotional connection to Father and that Nicholas believes that Eleanor's father is his father. *See id.* And there is no evidence that Father took any measures to contact Nicholas before DFPS initiated these proceedings or made any attempt to be a part of any decisions regarding Nicholas's well-being while Father was incarcerated. *See id.*

As the supreme court concluded, this evidence reflects Father's "choice not to monitor [Nicholas's] safety during his incarceration[] and his minimal effort to contact [Nicholas] or be part of decisions regarding [Nicholas's] health, education,

or well-being." *See id.* (quoting *In re J.F.-G.*, 627 S.W.3d at 318). Accordingly, based on all of the evidence detailed above, the trial court could have reasonably concluded that Father's lengthy history of escalating criminal conduct, as well as his indifference to Nicholas during his prolonged absence from Nicholas's life due to incarceration, constituted a course of conduct that endangered Nicholas's physical and emotional well-being.

In sum, after considering the entire record, including evidence both supporting and contradicting the finding, we conclude that any disputed evidence could have been reconciled in favor of the trial court's endangerment finding or was not so significant that the factfinder could not reasonably have formed a firm belief or conviction that Father's conduct endangered Nicholas. *See In re J.F.C.*, 96 S.W.3d at 266. We therefore hold that factually sufficient evidence supports the trial court's endangerment finding under Section 161.001(b)(1)(E).

## C. Best Interest of the Child

Having found that factually sufficient evidence supports the trial court's predicate finding under Section 161.001(b)(1)(E), we turn now to whether legally and factually sufficient evidence supports the trial court's determination that termination of Father's parental rights is in Nicholas's best interest.

16

### 1. Applicable Law

The best-interest inquiry focuses on the child's well-being, safety, and development. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). A best-interest determination is guided by several non-exclusive factors, the "*Holley* factors," including: (1) the child's desires; (2) the child's emotional and physical needs; (3) present and future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *See id.*; *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). We may also consider the statutory factors set forth in Section 263.307 of the Family Code. *See* TEX. FAM. CODE § 263.307; *In re A.C.*, 560 S.W.3d at 631 n.29.

It is not necessary that DFPS prove all of these factors as a condition precedent to termination. *In re C.H.*, 89 S.W.3d at 27. Accordingly, the absence of evidence concerning some of the factors does not preclude a factfinder from forming a firm belief or conviction that termination is in a child's best interest. *Id.*

## 2. Analysis

Based on the above standards, several factors support the trial court's finding here that termination of Father's parental rights is in Nicholas's best interest.

As detailed above, the record reflects that Father has twelve criminal convictions—including two for family violence—and that his crimes have escalated in seriousness since 2008. His most recent incarceration, which occurred after Nicholas's birth, resulted from convictions for assault of a family member and possession of methamphetamine, among others.

For these convictions, Father received a five-year sentence. Father also has a second conviction for possession of methamphetamine, which stems from a 2019 arrest that occurred on the same day as Father's last visit with Nicholas. A parent's inability to maintain a lifestyle free from arrests and incarcerations is relevant to the trial court's best-interest determination. *See In re E.S.T.*, No. 01-22-00404-CV, 2022 WL 17096713, at *18 (Tex. App.—Houston [1st Dist.] Nov. 21, 2022, no pet.) (mem. op.). Thus, Father's lengthy criminal history, which was at times violent, supports the trial court's finding that termination of his parental rights is in Nicholas's best interest. *See In re V.V.*, 349 S.W.3d at 558 (stating that trial court reasonably could have inferred that father's consistent, and at times violent, criminal conduct would put child in his custody in emotional and physical danger now or in future); *see also Holley*, 544 S.W.2d at 372 (factors two and three).

Moreover, Father has been incarcerated for the majority of Nicholas's life. He was incarcerated when Nicholas was born, when Nicholas was removed from Mother's care, and when his parental rights were terminated. Father admitted that although he lived with Nicholas and Mother for a short time before he was incarcerated, at the time of trial in 2023, he had not seen Nicholas since 2019.

Unless a parent has a valid excuse for his absence from a child's life, we have long considered evidence of little or no contact with the child to be proof of indifference that weighs heavily in favor of a trial court's best-interest finding. *See In re A.J.D.-J.*, 667 S.W.3d 813, 823 (Tex. App.—Houston [1st Dist.] 2023, no pet.) ("Parental indifference to one's offspring supports a finding that termination of parental rights is in a child's best interest under every one of the *Holley* factors. . . . Hence, significant evidence of parental indifference weighs heavily in favor of a factfinder's finding that termination is in a child's best interest."); *see also Holley*, 544 S.W.2d at 372 (factors one through nine).

Here, Father presented no evidence that he took any measures to contact Nicholas before DFPS initiated these proceedings or made any attempt to be a part of any decisions regarding Nicholas's well-being while Father was incarcerated. Although he testified that he requested video visits with Nicholas, the DFPS caseworker did not recall ever receiving such a request from Father. And Father admitted he did not know "a whole lot about" Nicholas, including what grade he was

19

in, his favorite food, or his favorite color, nor did he "have much of a relationship with" him. The guardian ad litem further testified that Nicholas has no emotional connection to Father and believes Eleanor's father is his father.

The trial court could have chosen to disbelieve Father's meager explanations or could have reasonably found them to be inadequate to explain his failure to have any contact with Nicholas for approximately four years. *See In re K.W.*, No. 01-23-00530-CV, 2024 WL 116938, at *9 (Tex. App.—Houston [1st Dist.] Jan. 11, 2024, pet. denied) (mem. op.). And this evidence of Father's indifference and prolonged absence from Nicholas's life weighs heavily in favor of the conclusion that termination is in Nicholas's best interest. *See In re A.J.D.-J.*, 667 S.W.3d at 824.

With respect to the plans for placement by the parties seeking custody and the stability of the home, Father admitted that he was unable to provide Nicholas with a safe and stable home due to his incarceration and that he did not provide DFPS with an alternative placement for Nicholas. Father testified that he wanted to see Nicholas returned to Mother's care, but Mother's parental rights have also been terminated.

In contrast, DFPS presented evidence that although Nicholas is not currently placed in an adoptive home, he is placed with a foster family along with Eleanor. The guardian ad litem testified that his foster family "would be willing to do anything to protect these children and to assure that they have a bright and happy future." The guardian ad litem also testified that a family who is willing to adopt

20

both Nicholas and Eleanor has been identified. This potential adoptive family has been in the children's lives for over a year and are very familiar with and close to the current foster family and the children. From this evidence, the trial court could have reasonably determined that DFPS's plan to keep Nicholas and Eleanor together in their foster home until they can be adopted will provide Nicholas with a permanent safe and stable home that he would not otherwise have with Father. *See Holley*, 544 S.W.2d at 372 (factors six and seven).

Father also points to evidence that he will be paroled soon, that he has been a model trustee while incarcerated, has worked seven days a week as a welder, has received letters of recommendation from the Sheriff to provide to the parole board, and that he is working towards his GED. He argues that this evidence "would leave one to believe that when [he] is paroled that he will be able to provide for [Nicholas] even if [Nicholas] is not placed with him and that termination would not necessarily be in [Nicholas's] best interest. While this is some evidence of improved conduct, such evidence, especially over a short duration, does not conclusively negate the probative value of a long history irresponsible choices, including violent behavior. *See In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009); *see also In re J.F.C.*, 96 S.W.3d at 272 (termination of parental rights in child's best interest despite evidence "mother found work," "parents' landlord . . . testified that their home was a 'safe

environment,'" and "parents made attempts to comply with some parts of the trial court's order").

On balance, the evidence demonstrates that the applicable statutory and *Holley* factors weigh in favor of the trial court's best-interest finding. Accordingly, after considering all the evidence in a light most favorable to the trial court's best-interest finding, we conclude that a reasonable trier of fact could have formed a firm belief or conviction that termination of Father's parental rights was in Nicholas's best interest. We further conclude that, viewed in light of the entire record, any disputed evidence could have been reconciled in favor of the trial court's best-interest finding or was not so significant that the factfinder could not reasonably have formed a firm belief or conviction that termination of Father's parental rights was in Nicholas's best interest. We therefore hold that legally and factually sufficient evidence supports the trial court's best-interest finding.

## Conclusion

Having found that factually sufficient evidence supports the trial court's endangerment finding under Section 161.001(b)(1)(E) and that legally and factually sufficient evidence supports the trial court's determination that termination of Father's parental rights is in Nicholas's best interest, we affirm the trial court's order of termination as to Father with respect to Nicholas in all things.

Terry Adams
Chief Justice

Panel consists of Chief Justice Adams and Justices Morgan and Dokupil.